UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

MONIQUE MCNEIL,
as Administratrix of the Estate of
TERRANCE DUNCAN,

                Plaintiff,

      -against-                          9:18-CV-0894 (LEK/DJS)

CORRECTIONAL MEDICAL
CARE, INC., *et al.*,

                Defendants.

---

## MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

      This action concerns the death of Terrance Duncan while in the custody of the

Schenectady County Correctional Facility ("SCCF"). Dkt. No. 1 ("Complaint"). He is alleged to

have died from complications stemming from sickle cell anemia. Id. ¶¶ 12, 33–34.

      On behalf of Duncan's estate, Monique McNeil has brought claims under 42 U.S.C.

§ 1983 against the County of Schenectady and Schenectady County Sheriff Dominic D'Agostino[1]

(collectively, the "County Defendants"); and Correctional Medical Care, Inc. ("CMC"), CBH

Medical, P.C. ("CBH"), CMC President Emre Umar, and John Does 1–3 (nurses employed by

CMC and/or CBH as nursing staff at SCCF) (collectively, the "Corporate Defendants"). Id. at

---

     [1] Sheriff D'Agostino has since been dismissed from this case by stipulation. See infra
Part II.B.

¶¶ 5–9, 11. Plaintiff has also sued Russell Fricke (a physician and medical director of SCCF employed by CMC).[2] Id. at ¶¶ 10, 19.

Before the Court are two motions to dismiss made pursuant to Federal Rule of Civil Procedure 12(b)(6): one filed on behalf of the County Defendants and another on behalf of the Corporate Defendants. Dkt. Nos. 10 ("County Defendants' Motion to Dismiss"); 10-5 ("County Defendants' Memorandum"); 11 ("Corporate Defendants' Motion to Dismiss"); 11-3 ("Corporate Defendants' Memorandum"); 22 ("Plaintiff's Response"); 27 ("County Defendants' Reply"); 29 ("Corporate Defendants' Reply"). Within their Motion to Dismiss, Corporate Defendants also move to strike portions of the Complaint. Corporate Defs.' Mem. at 17–21 ("Motion to Strike").

For the following reasons, the County Defendants' Motion to Dismiss is denied, the Corporate Defendants' Motion to Dismiss is granted in part and denied in part, and the Motion to Strike is denied.

## II.     BACKGROUND

### A.    Factual Background

The Court draws all facts, which are assumed to be true, from the Complaint. Bryant v. N.Y. State Educ. Dep't, 692 F.3d 202, 210 (2d Cir. 2012). "For purposes of a motion to dismiss," the Second Circuit "deem[s] a complaint to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference . . . and documents that the

---

[2]  Although Fricke works for CMC, he, unlike CMC, CBH, Umar, and John Does 1–3, has answered Plaintiff's complaint instead of moving to dismiss the case. Dkt. No. 30 ("Fricke Answer"). Thus, Fricke is not grouped in with the other Corporate Defendants.

plaintiffs either possessed or knew about and upon which they relied in bringing the suit." Rothman v. Gregor, 220 F.3d 81, 88–89 (2d Cir.2000).

Duncan entered the custody of SCCF on July 3, 2015 and remained there as a pretrial detainee until he died on August 2, 2015. Compl. ¶¶ 12, 15, 68 n.2. Upon booking into SCCF, Duncan "reported that he had Sickle Cell Anemia, stomach cancer, and asthma." Id. ¶ 15. People with "Sickle Cell disease can also experience a Sickle Cell crisis, which can last hours to days, and may result in death without appropriate and timely intervention." Id. Duncan "had been successfully managing his medical conditions for years." Id. ¶ 34.

Over the course of July 2015 and, in particular, in the three days preceding his death, Duncan "was both evaluated, and, on two occasions, hospitalized for severe pain associated with his Sickle Cell disease while detained at [SCCF]." Id. ¶ 17. Upon admittance to SCCF, Duncan was "hospitalized for complaints of pain, and to rule out whether he was in a sickle cell crisis." Id. ¶ 16. Once the hospital "stabilized" Duncan it discharged him back to jail "with instructions to return him to the hospital if the symptoms worsened." Id. On July 5, 2015, a John Doe Nurse evaluated Duncan "in response to a medical emergency that was called by corrections staff" as he "was observed on the floor holding onto his chest". Id. ¶ 18. On July 7, 2015, Fricke "conducted a physical [examination]" of Duncan. Id. ¶ 19. During this examination Fricke "was personally advised of the [Duncan's] Sickle Cell disease." Id. "[N]o treatment plan was implemented to monitor [Duncan's] condition" besides providing Duncan with "pain medication" even though Duncan "complained about being in severe pain." Id. On July 8, 2015, Duncan "filed a sick call slip with the medical department complaining about severe pain that had been keeping him up for several days." Id. ¶ 20. Duncan "was later observed by a nurse lying on the floor of his cell

complaining about pain." Id. On July 9 and 13, 2015, Duncan "filed sick call slips requesting to see Dr. Fricke for complaints about pain." Id. ¶ 21.

From thereon Duncan's "condition significantly worsened." Id. ¶ 22. On July 30, 2105, Duncan was hospitalized after he was "evaluated for complaints of severe pain all over his body on several occasions throughout the day." Id. ¶ 23. A John Doe Nurse observed that Duncan "had been evaluated on multiple occasions over the past several days with no improvement." Id. At the hospital, medical staff "ruled out a sickle cell crisis," but observed Duncan "in severe pain and discomfort." Id. ¶ 24. The staff provided Duncan "with pain medication, and instructed the jail to return [Duncan] to the hospital if his symptoms persisted or worsened." Id. These instructions were relayed to Fricke. Id.

Although Duncan "was returned to jail during the early morning hours of July 31, 2015," Duncan's "symptoms did in fact worsen." Id. ¶¶ 24–25. Between July 31 and August 2, 2015, Duncan was evaluated "[o]n several occasions" for "complaints of pain, numbness, and weakness." Id. ¶¶ 25–26. On August 2, 2015, Duncan's condition "precipitously declined." Id. ¶ 27. That morning, Duncan "was observed by nurses refusing to get out of bed, respond to orders, or go to the medical department." Id. ¶ 28. At 5:45 PM, "a corrections officer requested that a nurse evaluate [Duncan]." Id. ¶ 29. A John Doe Nurse observed Duncan to be lethargic. Id. At 9:30 PM, a corrections officer once again requested that a nurse evaluate Duncan. Id. ¶ 31. Duncan was observed "sitting on the floor next to his toilet, and unresponsive to commands." Id. At 9:40 PM, nurses found Duncan "on his stomach[] and unresponsive," but "[r]ather than immediately send him to the hospital, Dr. Fricke ordered the nurses to wait another hour to see if he continued to decline." Id. ¶ 33. "However, when Mr. Duncan was checked on again

4

approximately a half hour later, he was unconscious. Although rescue attempts were made, Mr. Duncan could not be resuscitated. Mr. Duncan died as a result of suffering from an untreated sickle cell crisis." Id.

Plaintiff claims CMC, CBH, and Umar "have engaged in a well-documented pattern and practice of providing inadequate and unqualified medical providers at the various facilities they manage," including SCCF, which "resulted in [Duncan's] death". See id. ¶¶ 36, 38. "CMC and CBH's contract with Schenectady County is an 'all in,' capitation contract, where the County government pays a set fee for health services at their local jail, regardless of the medical needs of the relevant detainees." Id. ¶ 38. Thus, CMC's and CBH's business model "provides strong and systemic disincentives for the provision of appropriate healthcare for detainees" because "all medical care provided to detainees comes directly out of the profit margin of CMC and CBH Medical." Id. Moreover, under the business model "nursing assessments assume that the most minor problem is occurring, and provide palliative treatments" instead of "rul[ing] out the most serious condition as part of determining the source of a patient's medical problems." Id. ¶ 41.

The New York State Commission of Correction ("Commission") "issued a harshly critical opinion about the medical care that was provided to Mr. Duncan." Id. ¶ 12. Although nursing staff and Fricke suspected that Duncan's severe symptoms on August 2 were caused by a drug overdose, "they made no effort to conduct a differential diagnosis to rule out any other conditions." Id. ¶¶ 29–30. "The Commission found that, during this encounter, Defendant Fricke and nursing staff 'failed to recognized a critically unstable patient that needed immediate intervention and failed to initiate an emergency transfer to a hospital.'" Id. ¶ 30.

The Commission has issued reports on CMC's failure to provide appropriate care to inmates at multiple correctional facilities, documenting at least twenty-four inmate deaths (including three at SCCF) going back to 2009. Id. ¶ 42. Each negative report issued by the Commission is "sent to the Sheriff of the Correctional Facility, and the executive employees of [CMC], including Umar." Id. ¶ 49. In sworn testimony in another litigation, Umar "confirmed . . . that he has taken no remedial action in response" to the Commission's reports. Id. ¶ 49. The Commission concluded, "As the issue regarding CMC's Inc's [sic] ability to provide competent medical care has been the subject of multiple reviews in multiple locations by the Medical Review Board, the Schenectady County Sheriff should consider terminating the contract for cause." Id. ¶ 44. Yet even though "Schnectady County and Sheriff D'Agostino were well aware of [CMC] and [CBH's] trouble history, and its capitation business model," the County "renewed the company's contract to provide healthcare at [SCCF] over the course of multiple years." Id. ¶ 62. Plaintiff alleges Sheriff D'Agostino had an incentive to "look the other way while his inmates die and suffer egregious injuries" because he received "thousands of dollars" in "campaign contributions" from CMC. Id. ¶¶ 60–61.

The New York State Attorney General also "subjected [CMC] to a lengthy investigation" at the end of which CMC was required to "sign a consent decree." Id. ¶¶ 45, 54. The settlement agreement found that CMC "employed 'unlicensed and inexperienced staff; inadequate staffing; lack of adequate medical oversight; and failure to adhere to medical and administrative protocols and procedures.'" Id. ¶ 56. And in a press release describing the settlement, the Attorney General stated that "CMC's actions represented 'substandard care and mismanagement,' and that CMC was 'shortchanging medical services' for detainees.'" Id. ¶ 55. The Attorney General also

directed an outside company to audit CMC's medical practices at the Albany County Correctional Facility and the audit found that "almost no sick call encounters were assessed by the nurses in compliance with the robust, well-developed nursing protocols set forth by CMC;" that "[n]ursing assessments were minimal and often superficial. In particular, complaints of pain were poorly assessed;" and that "the sick call process is almost exclusively a reactive process; nurses did not initiate follow up with inmates to check progress of a condition." Id. ¶ 47 (internal quotation marks omitted). And after conducting a review of the Tioga County Jail, the Attorney General found that "CMC staff did not 'make necessary referrals to a psychiatrist or physician.'" Id. ¶ 59.

There have been a number of federal lawsuits brought in New York and Pennsylvania against CMC related to the denial of care or the provision of inadequate care to inmates who died or were severely injured. Id. ¶ 42. Some of these cases have survived motions to dismiss and resulted in settlements. Id.

### B. Procedural History

On July 31, 2018, McNeil, as administratrix of Duncan's estate, filed a complaint in this action. Compl. The Complaint brought two causes of action. Id. ¶¶ 67–78. In her first cause of action, Plaintiff alleged violations of the Fourteenth Amendment and 42 U.S.C. § 1983 against Fricke and John Does 1–3 for providing Duncan with inadequate medical care. Id. ¶¶ 67–72. In her second cause of action, Plaintiff alleged violations of the Fourteenth Amendment under § 1983 against all defendants (except John Does 1–3) for their implementation of policies which provide inadequate medical care to detainees at SCCF and "many other local jails across the

state." Id. ¶¶ 73–78.[3] Plaintiff has requested compensatory damages, punitive damages (except from Sherif D'Agostino), and attorneys' fees. Id. ¶ 79, at 27.

On October 4, 2018, County Defendants filed their Motion to Dismiss. Cty. Defs.' Mot Dismiss. And on October 6, 2018, Corporate Defendants filed their Motion to Dismiss and Motion to Strike. Corp. Defs.' Mot Dismiss; Mot. Strike. On November 2, 2018, this Court entered a stipulation signed by both parities dismissing Sheriff D'Agostino from the case. Dkt. No. 19 ("Stipulation of Discontinuance"). Plaintiff filed a response to each Motion to Dismiss that same day. Pl.'s Resp. On November 14 and 16, 2018, County Defendants and Corporate Defendants replied to Plaintiff's Response, respectively. Cty. Defs.' Reply; Corp. Defs.' Reply. Fricke filed his answer to the Complaint on December 7, 2018. Dkt. No. 30 ("Fricke Answer").

## III. LEGAL STANDARD

### A. Motion to Dismiss

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter . . . 'to state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. In assessing whether this standard has been met, courts "must accept all allegations in the complaint as true and draw all inferences in the light most favorable to the non-moving party's favor." In re NYSE Specialists Sec. Litig., 503 F.3d 89, 95 (2d Cir. 2007)

---

[3] Although not explicitly stated, the Court construes Plaintiff's second cause of action to assert municipal liability under Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658 (1978).

(internal citation omitted).

**B.      Motion to Strike**

Under Federal Rule of Civil Procedure 12(f), the Court may strike "an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Motions to strike, though, are "highly disfavored," <u>Lee v. E*Trade Fin. Corp.</u>, No. 12-CV-6543, 2013 WL 4016220, at *7 (S.D.N.Y. Aug. 6, 2013), and "will be denied unless the matter asserted clearly has no bearing on the dispute or the matter is significantly prejudicial to one of the parties," <u>Citigroup, Inc. v. Wachovia Corp.</u>, 613 F. Supp. 2d 485, 489 (S.D.N.Y.2009) (internal citations omitted). Indeed, "[i]t is settled in this Circuit that [such a] motion will be denied 'unless it can be shown that no evidence in support of the allegation would be admissible.'" <u>Kehr ex rel. Kehr v. Yamaha Motor Corp.</u>, 596 F. Supp. 2d 821, 829 (S.D.N.Y. 2008) (quoting <u>Lipsky v. Commonwealth United Corp.</u>, 551 F.2d 887, 893 (2d Cir. 1976)). "Thus the courts should not tamper with the pleadings unless there is a strong reason for doing so." <u>Lipsky</u>, 551 F.2d at 893.

**IV.     DISCUSSION**

**A.      Motion to Dismiss**

*1.      Section 1983 Generally*

"42 U.S.C. § 1983 provides a civil claim for damages against any person who, acting under color of state law, deprives another of the right, privilege or immunity secured by the Constitution or the laws of the United States." <u>Thomas v. Roach</u>, 165 F.3d 137, 142 (2d Cir. 1999). Section 1983 does not create any substantive rights; it provides civil litigants a procedure to redress the deprivation of rights established elsewhere. <u>Id.</u> (citing <u>City of Oklahoma City v. Tuttle</u>, 471 U.S. 808 (1985)). "To prevail on a § 1983 claim, a plaintiff must establish that a person acting under the color of state law deprived him of a federal right." <u>Id.</u>

9

2.      *Section 1983 Claims for Denial of Medical Care*

a.      Legal Standard

Where a plaintiff was allegedly deprived of medical care, courts construe the rights the plaintiff seeks to vindicate as arising under either the Eighth Amendment prohibition against cruel and unusual punishment, Caiozzo v. Koreman, 581 F.3d 63, 69 (2d Cir. 2009), or the Fourteenth Amendment's Due Process Clause, Darnell v. Pineiro, 849 F.3d 17, 29 (2d Cir. 2017). However, "Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions . . . . The State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law." City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983) (internal quotation marks and alterations omitted).

Instead, "[a] pretrial detainee's claims of unconstitutional conditions of confinement are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eight[h] Amendment." Darnell, 849 F.3d at 29. The Second Circuit has clarified:

> In Darnell, the plaintiffs complained, inter alia, that the facility where they were detained was unsafe and unsanitary. Although Darnell did not specifically address medical treatment . . . the same standard applies to claims for deliberate indifference to medical needs because deliberate indifference means the same thing for each type of claim under the Fourteenth Amendment.

Charles v. Orange Cty., 925 F.3d 73, 87 (2d Cir. 2019) (internal citations and quotation marks omitted). Therefore, because Duncan was merely a pretrial detainee, Compl. ¶ 68 n.2, and not a

sentenced prisoner, his claim is properly brought as a violation of his Fourteenth Amendment rights.

Before <u>Darnell</u>, a plaintiff alleging deliberate indifference to medical needs needed to satisfy two prongs: an "objective prong" showing that "the alleged deprivation [was] sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain, existed," <u>Hill v. Curcione</u>, 657 F.3d 116, 122 (2d Cir. 2011) (quoting <u>Hathaway v. Coughlin</u>, 99 F.3d 550, 553 (2d Cir. 1996),[4] and a "'<u>mens rea</u> prong,' or 'mental element prong'—showing that the officer acted with at least deliberate indifference to the challenged conditions," <u>Darnell</u>, 849 F.3d at 29. Prior to <u>Darnell</u>, the second prong was assessed subjectively in claims brought under both the Eighth and Fourteenth Amendments. See <u>Spavone v. N.Y. State Dep't of Corr. Servs.</u>, 719 F.3d 127, 138 (2d Cir. 2013) ("The second requirement is subjective: the charged officials must be subjectively reckless in their denial of medical care."); <u>Caiozzo</u>, 581 F.3d at 70 ("[T]he standard for deliberate indifference is the same under the Due Process Clause of the Fourteenth Amendment as it is under the Eighth Amendment.").

However, in light of the Supreme Court's ruling in <u>Kingsley v. Hendrickson</u>, 135 S. Ct. 2466, (2015), the Second Circuit has held that in claims brought pursuant to the Fourteenth Amendment:

> [T]he pretrial detainee must prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to

---

[4] The analysis of the "objective prong" is the same under both the Eighth and Fourteenth Amendments. <u>Darnell</u>, 849 F.3d at 30.

health or safety. In other words, the "subjective prong" (or "<u>mens rea</u> prong") of a deliberate indifference claim is defined objectively.

<u>Darnell</u>, 849 F.3d at 35. "Thus, a detainee asserting a Fourteenth Amendment claim for deliberate indifference to his medical needs can allege either that the defendants <u>knew</u> that failing to provide the complained of medical treatment would pose a substantial risk to his health or that the defendants <u>should have known</u> that failing to provide the omitted medical treatment would pose a substantial risk to the detainee's health." <u>Charles</u>, 925 F.3d at 87 (emphasis in original).

Determining whether a deprivation is sufficiently serious under the objective prong involves two inquiries. <u>Salahuddin v. Goord</u>, 467 F.3d 263, 279 (2d Cir. 2006). The first question is whether the plaintiff was actually deprived of adequate medical care. <u>Id.</u> Prison officials who act "reasonably" in response to the inmate's health risk will not be found liable under the Eighth Amendment because the official's duty is only to provide "reasonable care." <u>Id.</u> at 279–80 (citing <u>Farmer v. Brennan</u>, 511 U.S. 825, 844–47 (1994)). The second part of the objective-prong analysis asks whether the purported inadequacy in the provision medical care is "sufficiently serious." <u>Salahuddin</u>, 467 F.3d at 280. The court must examine how the care was inadequate and what harm the inadequacy has caused or will likely cause the prisoner. <u>Id.</u> (citing <u>Helling v. McKinney</u>, 509 U.S. 25, 32–33 (1993)). If the "unreasonable care" consists of a failure to provide any treatment, then a court examines whether the inmate's condition itself is "sufficiently serious." <u>Id.</u> (citing <u>Smith v. Carpenter</u>, 316 F.3d 178, 185–86 (2d Cir. 2003). Factors to determine the "seriousness of the medical condition include whether a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly

affects an individual's daily activities, and whether it causes chronic and substantial pain."

Salahuddin, 467 F.3d at 280 (internal quotation marks and alterations omitted).

### b. Application

Plaintiff claims that John Does 1–3 and Fricke exhibited deliberate indifference to Duncan's medical needs. Compl. ¶¶ 67–72. As Fricke has not sought dismissal of Plaintiff's Complaint regarding her deliberate indifference claim against him, the Court addresses the Corporate Defendants' Motion to Dismiss only with regards to the John Does.

The objective prong is satisfied only if Duncan was deprived of adequate care. See Salahuddin, 467 F.3d at 279. The Court finds Plaintiff has sufficiently pleaded that John Does 1–3 deprived Duncan of adequate medical care. They "failed to recognize Duncan's declining physical and mental status on several occasions that should have initiated an immediate transfer to a hospital." Compl. ¶ 35 (internal quotation marks omitted). They also failed to "perform an adequate and timely nursing assessment based on critical information reported by a [nurse] regarding Duncan's physical appearance and lethargy." Id. "While disagreements regarding choice of treatment are generally not actionable under the Eighth Amendment, judgments that have no sound medical basis, contravene professional norms, and appear designed simply to justify an easier course of treatment (in this case, no treatment) may provide the basis of a claim." Stevens v. Goord, 535 F. Supp. 2d 373, 388 (S.D.N.Y. 2008). Despite evaluating Duncan on several occasions for "complaints of pain, numbness, and weakness" that worsened between July 31 and August 2, 2015, John Does 1–3 did not send Duncan to the hospital even though SCCF was instructed "to return [Duncan] to the hospital if his symptoms persisted or worsened." Compl. ¶¶ 22, 24–25.

Regarding the second part of the objective prong inquiry, sickle cell anemia, and sickle cell crisis, represents a "sufficiently serious" medical condition. Lewis v. McGraw, No. 2-CV-5568, 2005 WL 3050306, at *8 (S.D.N.Y. Nov. 14, 2005) ("[T]he Court accepts that sickle cell anemia and the type of crises that Lewis describes—those involving a risk of organ deterioration and failure—may be the type of serious medical condition toward which deliberate indifference could constitute a constitutional violation."); see also Reyes v. Gardener, 93 F. App'x 283, 284 (2d Cir. 2004) (holding sickle cell crisis to be a "objectively serious medical condition" for the purposes of the Eighth Amendment). As evidenced by Duncan's severe pain, lethargy, and eventual death while incarcerated at SCCF, his sickle cell anemia (and accompanying sickle cell crisis) were "condition[s] of urgency that may result in degeneration or extreme pain." Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) (internal quotation marks omitted), "where the failure to treat . . . could result in further significant injury or the unnecessary and wanton infliction of pain," Harrison v. Barkley, 219 F.3d 132, 137 (2d. Cir. 2000) (internal quotation marks omitted).

Finally, the subjective prong is satisfied since John Does 1–3 "knew[] or should have known" that failing to provide Duncan with medical treatment for his sickle cell disease "posed an excessive risk to [his] health or safety." See Darnell, 849 F.3d at 35; see also Charles, 925 F.3d at 87. According to Plaintiff, Duncan "reported that he had Sickle Cell Anemia . . . ." Compl. ¶ 15. And, during Duncan's brief period of incarceration at SCCF, the nursing staff observed Duncan on multiple occasions in significant pain or in a lethargic state. See id. ¶¶ 18, 20, 25–26, 29. On two occasions, Duncan was "hospitalized for severe pain associated with his Sickle Cell Disease while detained at [SCCF]." Id. ¶ 17. Yet just before his death, nurses found

14

Duncan "on his stomach[] and unresponsive" but did not send him to the hospital even though hospital staff had "instructed the jail to return [Duncan] to the hospital if his symptoms persisted or worsened". Id. ¶¶ 24, 33. "Plaintiff['s] allegations, if proven true, are sufficient to establish that Defendants knew, or should have known, of the substantial risk that" Duncan would "suffer serious adverse health consequences if" he were not provided with adequate medical treatment, "such that a fact-finder could infer reckless disregard beyond mere negligence or medical malpractice." See Charles, 925 F.3d at 89.

The SCCF medical staff is bound by ethical obligations not necessarily applicable to other employees of the correctional facility. See Rhinehart v. Scutt, 894 F.3d 721, 738 (6th Cir. 2018) ("A doctor, after all, is bound by the Hippocratic Oath, not applicable to the jailor, and the physician's job is to treat illness, not punish the prisoner."). The SCCF had a professional obligation to safeguard Duncan's well-being. Plaintiff's allegations, if true, suggest the SCCF medical staff consciously disregarded their ethical obligations leading to Duncan's death. Prisoners are entitled to no less medical care than those outside prison.

In sum, the Court finds Plaintiff has plausibly stated a claim of deliberate indifference based on John Does 1–3's denial of adequate treatment. Accordingly, Corporate Defendants' Motion to Dismiss the deliberate indifference claims against John Does 1–3 is denied.

3. *Section 1983 Claims Against Municipalities, namely, "Monell Claims"*

Plaintiff claims that Corporate Defendants implemented policies and practices aimed at providing inadequate medical care to inmates and thereby violated Duncan's constitutional rights pursuant to Monell, 436 U.S. at 691. Compl. ¶¶ 73–76, 78. Plaintiff further alleges that, under Monell, Schenectady County "is directly liable for the actions of [CMC] and [CBH] as they

cannot delegate their constitutionally mandated responsibility to provide health care to detainees at a local jail." Id. at ¶ 77. Both Corporate Defendants and County Defendants seek dismissal of Plaintiff's Monell claims. Corp. Defs.' Mem. at 13–16; Corp. Defs.' Reply at 8–12; Cty. Defs.' Mem. at 7–12; Cty. Defs.' Reply at 1–5. As Fricke has not sought dismissal of Plaintiff's Complaint regarding her Monell claim against him, the Court addresses the Corporate Defendants' Motion to Dismiss only with regards to CBH, CMC, and Umar.

a.     Legal Standard

"[A] municipality cannot be held liable [under Section 1983] solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." Monell, 436 U.S. at 691 (emphasis in original). "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." Id. at 694. "Monell does not create a stand-alone cause of action under which a plaintiff may sue over a governmental policy, regardless of whether he suffered the infliction of a tort resulting from the policy." Askins v. Doe No. 1, 727 F.3d 248, 253 (2d Cir. 2013). Rather, "[l]iability under § 1983 is imposed on the municipality when it has promulgated a custom or policy that violates federal law and, pursuant to that policy, a municipal actor has tortiously injured the plaintiff." Id. "Official municipal policy includes" not only "the decisions of a government's lawmakers," but also "the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law. . . . These are 'action[s] for which the municipality is actually responsible.'" Connick v. Thompson, 563 U.S. 51, 61 (2011) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 479–80 (1986)). Thus, a

§ 1983 plaintiff need not prove that his injury was caused by an explicitly stated municipal rule or regulation.

A municipality may be liable for its inaction if, in its failure to act, it "exhibit[ed] deliberate indifference to constitutional deprivations caused by subordinates." Cash v. Cty. of Erie, 654 F.3d 324, 334 (2d Cir. 2011) (internal quotation marks omitted), cert. denied, 565 U.S. 1259 (2012); see generally City of Canton, Ohio v. Harris, 489 U.S. 378, 388–92 (1989). "[A] municipal policy of deliberate indifference . . . may be shown by evidence that the municipality had notice of complaints" of violations "but repeatedly failed to make any meaningful investigation into such charges." Outlaw v. City of Hartford, 884 F.3d 351, 380 (2d Cir. 2018). "Thus, Monell liability, by its nature, will often turn on evidence concerning victims other than the plaintiffs and alleged misfeasors other than the individual defendants." Id. Awareness of "highly publicized incidents" at other New York correctional facilities, combined with a failure to take appropriate action, can be sufficient to establish a Monell claim against a policy-maker. Cash, 654 F.3d at 336.

In addition, to establish Monell liability, a plaintiff must show a causal link between the policy, custom, or practice and the alleged constitutional injury. Roe v. City of Waterbury, 542 F.3d 31, 36 (2d Cir. 2008) (observing that a plaintiff must demonstrate that, through its deliberate conduct, the municipality was the "moving force" behind the Plaintiff's alleged injury) (internal quotation marks omitted).

"Although Monell dealt with municipal employers, its rationale has been extended to private businesses." Rojas v. Alexander's Dept. Store, Inc., 924 F.2d 406, 409 (2d Cir. 1990); see Bess v. City of New York, No. 11-CV-7604, 2013 WL 1164919, at *2 (S.D.N.Y. Mar. 19, 2013)

("In providing medical care in prisons, [defendant corporation] performs a role traditionally within the exclusive prerogative of the state and therefore, in this context, is the functional equivalent of the municipality."). A private company providing medical care to prisoners on behalf of a county may, therefore, be liable under a municipal liability theory if it maintains a custom or policy that causes a violation of a prisoner's constitutional rights, and is found to be acting under the color of state law. See Shomo v. City of New York, 579 F.3d 176, 185 n.3 (2d Cir. 2009) (allowing prisoner to replead municipal liability claim against private medical provider to determine if it was acting under color of state law). "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action has exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." Carlos v. Santos, 123 F.3d 61, 65 (2d Cir. 1997) (internal quotation marks omitted).

### b.    Application

Plaintiff alleges that all Defendants, except John Does 1–3, had a policy and custom of unconstitutionally depriving prisoners of adequate health care. Compl. ¶¶ 73–78. Plaintiff further alleges that this policy caused Duncan's death. Id. ¶ 78.

#### (1)    CBH and CMC

CBH is the medical provider at SCCF, where it performs a function traditionally "within the exclusive prerogative of the state." See Bess, 2013 WL 1164919 at *2; Comp. ¶ 6. It is therefore the "functional equivalent of the municipality," and potentially subject to Monell liability. Id. However, Corporate Defendants argue that "[t]he Complaint contains no allegation that [CMC] was responsible for providing medical care at SCCF for the relevant time period."

Corp. Defs.' Mem. at 13. Plaintiff admittedly does not allege CMC's involvement in the provision of medical care at SCCF beyond the execution of a contract between CMC and Schenectady County to provide medical services at the jail for multiple years. Compl. ¶¶ 38, 46, 62. However, the existence of this contractual arrangement suggests that CMC had a policy of sanctioning inadequate medical care that violated Plaintiff's constitutional rights and therefore affected the health care Plaintiff received at SCCF. See D'Agostino v. Montgomery Cty., No. CA 11-7728, 2012 WL 425071, at *4 (E.D. Pa. Feb. 9, 2012) (Finding "Plaintiff's allegation that the County and CMC entered into a written contract which created a financial disincentive to meet the serious medical needs of inmates who required referral to outside medical providers" along with "the allegation that" a doctor "acted pursuant to a resulting policy, practice or custom which discouraged outside referrals, is sufficient to state a claim of [Monell liability] at this stage of the litigation"). Plaintiff alleges that Schenectady County has a contract with CMC that provides the same disincentives as the policy discussed in D'Agostino. See Compl. ¶ 38. Plaintiff further alleges that such disincentives "affected the care provided to Mr. Duncan." Id. Consequently, the existence of the aforementioned contract and Plaintiff's "allegations of a problematic practice or policy, known to and ratified by defendants, of denying medical care for cost-saving reasons sufficiently elevate the Complaint, perhaps only barely, from being merely a blanket, general assertion of entitlement to relief."[5] See Kenney v. Montgomery Cty., No. CIV.A. 13-2590, 2013

---

[5] Corporate Defendants' reliance on Iacovangelo v. Corr. Med. Care, Inc., No. 13-CV-6466, 2014 WL 4955366, (W.D.N.Y. Oct. 2, 2014), aff'd in part, vacated in part, remanded, 624 F. App'x 10 (2d Cir. 2015) does not change the Court's conclusion. In Iacovangelo, the Court found that "given the very large number of inmates that CMC employees must have treated over the years on a continuous basis, nine unrelated deaths, five of which were by suicide and one of which was due to an undetermined cause, over the course of several years does not plausibly suggest the existence of a policy of providing sub-standard care in order to

WL 5356862, at *7 (E.D. Pa. Sept. 25, 2013) (citations and internal quotation marks omitted). The Court therefore declines to dismisses Plaintiff's claims of <u>Monell</u> liability against CBH and CMC.

### (2)    Umar

Plaintiff appears to bring a claim against Umar based on his personal involvement in Duncan's inadequate treatment because he "was responsible for the practices of his company that led to widespread constitutional violations, including preventable deaths and grievous injuries suffered by detainees that were under CMC/CBH's care." Pl.'s Resp. at 20–21. However, Plaintiff's allegations of such personal involvement are too thin. All that Plaintiff has alleged is that Umar is president of CMC, that he once testified to the fact that CMC's profit margins vary with the amount of services CMC provides, that Umar once provided a bonus to and offered to pay legal fees for an employee found by the New York State Department of Education to have practiced without a medical license in violation of state law, that Umar received the Commission's negative reports regarding CMC's provision of medical care at correctional

---

save money, such as is alleged here." <u>Id.</u> at *16. Here, though, Plaintiff cites to Commission reports documenting at least twenty-four inmate deaths (including three at SCCF) going back to 2009. Compl. ¶ 42. Furthermore, the <u>Iacovangelo</u> court did not consider whether a county's contract with CMC bears on the issue of CMC's <u>Monell</u> liability.

Additionally, <u>Helijas v. Corr. Med. Care, Inc.</u>, No. 15-CV-1049, 2016 WL 5374124 (N.D.N.Y. Sept. 26, 2016), upon which Corporate Defendants also rely, does not change the Court's conclusion. The <u>Helijas</u> court found that the plaintiff had "not alleged facts plausibly suggesting a sufficiently widespread practice among CMC employees" to support a holding that the plaintiff sufficiently alleged <u>Monell</u> liability, <u>id.</u> at *15, but the Court concludes that Plaintiff has done so here. Moreover, like in <u>Iacovangelo</u>, the <u>Helijas</u> court did not consider whether a county's contract with CMC bears on the issue of CMC's <u>Monell</u> liability.

facilities, and that Umar testified in another litigation he has failed to take action in response to the Commission's reports. Compl. ¶¶ 9, 37, 42, 49. Plaintiff has not sufficiently alleged details about Umar's involvement in creating or allowing unconstitutional policies, such as CMC's policy of sanctioning inadequate medical care, or how his actions caused violations of Duncan's constitutional rights. See Barnes v. Cty. of Broome, No. 17-CV-1398, Memorandum-Decision and Order, at 26 (N.D.N.Y. filed Aug. 8, 2018) (Kahn, J.) (dismissing a Monell claim against Umar on similar set of facts and for similar reasons). Hence, Plaintiff's allegations are insufficient to demonstrate a basis for subjecting Umar to Monell liability, and the Court grants Corporate Defendants' Motion to Dismiss as to Umar.

### (3)     Schenectady County

Plaintiff claims, "The County of Schenectady is directly liable for the actions of [CMC] and [CBH] as they cannot delegate their constitutionally mandated responsibility to provide health care to detainees at a local jail." Compl. ¶ 77. The Court finds persuasive Plaintiff's discussion of Ancata v. Prison Health Servs. Inc., 769 F.2d 700 (11th Cir.1984) in support of this claim. Pl.'s Resp. at 24–25. In Ancata, the Eleventh Circuit held that Broward County could not relieve itself of liability for constitutional violations by contracting away, with private entities, the duty to provide medical care to inmates. The plaintiff, who represented the estate of the deceased, sued Broward County, its sheriff, and Prison Health Services (the private entity responsible for providing medical care to those housed at the Broward County Jail) pursuant to § 1983 alleging cruel and unusual treatment based on deliberate indifference to the deceased's medical needs. Id. at 701. While the district court dismissed all claims against all defendants, the circuit court reversed. Id. at 701, 705. In regards to Broward County the court noted:

The federal courts have consistently ruled that governments, state and local, have an obligation to provide medical care to incarcerated individuals. This duty is not absolved by contracting with an entity such as Prison Health Services. Although Prison Health Services has contracted to perform an obligation owed by the county, *the county itself remains liable for any constitutional deprivations caused by the policies or customs of the Health Service*. In that sense, the county's duty is non-delegable.

Id. at 705 (internal citation omitted and emphasis added).

Although Plaintiff's Complaint focuses on how CMC and CBH, rather than Schenectady County, had a policy of providing inappropriate medical care to detainees at SCCF, here, as in Carter v. Broome Cty., No. 16-CV-422, 2019 WL 3938088 (N.D.N.Y. Aug. 21, 2019), "Plaintiff connects CMC's alleged provision of constitutionally inadequate medical care and services to the County, which contracted with CMC to provide medical services at the Jail during the time period relevant here." Id. at *9; Compl. ¶¶ 38, 46, 62. "Contracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody, and it does not deprive the State's prisoners of the means to vindicate their Eighth Amendment rights." Carter, 2019 WL 3938088, at *9 (internal quotation marks and alterations omitted) (quoting West v. Atkins, 487 U.S. 42, 56 (1988); see also King v. Kramer, 680 F.3d 1013, 1020 (7th Cir. 2012) ("The County cannot shield itself from § 1983 liability by contracting out its duty to provide medical services . . . [t]he underlying rationale is not based on respondeat superior, but rather on the fact that the private company's policy becomes that of the County if the County delegates final decision-making authority to it."). Accordingly, Schenectady County "remains liable for any constitutional deprivations caused by the policies or customs" of CMC and CBH. See Ancata, 769 F.2d at 705; see also Black v. Allegheny Cty., 2014 WL 5493811, at

*10 (W.D. Pa. Oct. 30, 2014) (denying summary judgment to Allegheny County on a <u>Monell</u> claim where issues of fact remained to be tried on private medical contractor's policy or practice). Plaintiff's claim against Schenectady County for <u>Monell</u> liability may therefore proceed.

### 4. *Punitive Damages*

Corporate Defendants argue that the Court should dismiss Plaintiff's claim for punitive damages because "Plaintiff has failed to plead the appropriate standard for this type of relief" and because "the underlying claims, as set forth above, seek but fail to properly plead, at most a medical malpractice action, not grossly indifferent or intentional conduct." Corp. Defs.' Mem. at 16. "Punitive damages are available in a [S]ection 1983 case 'when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" <u>Mathie v. Fries</u>, 121 F.3d 808, 815 (2d Cir. 1997) (quoting <u>Smith v. Wade</u>, 461 U.S. 30, 56 (1983)).[6] "Generally, the issue of whether to award punitive damages is an issue for the jury to decide based on an evaluation of plaintiff's proof of 'sufficiently serious misconduct.'" <u>Phelan ex rel. Phelan v. Torres</u>, No. 4-CV-3538, 2005 WL 4655382, at *15 (E.D.N.Y. Sept. 20, 2005) (quoting <u>Smith</u>, 461 U.S. at 52). Thus, the Court concludes that the issue on whether Plaintiff is entitled to punitive damages is "better addressed with the benefit of an evidentiary record." <u>See</u> <u>Richardson v. Corr. Med. Care, Inc.</u>, No. 17-CV-0420, 2018 WL 1580316, at *8 (N.D.N.Y. Mar. 28, 2018).

---

[6] Plaintiff agrees: "In order to determine whether punitive damages are appropriate, courts look to whether the Defendants 'acted intentionally or recklessly to deny a plaintiff his protected rights." <u>See</u> Pl.'s Resp. at 28 (quoting <u>McFadden v. Sanchez</u>, 710 F.2d 907, 913 (2d Cir. 1983)).

**B.     Motion to Strike**

*1.     Consent Decree*

Corporate Defendants first ask the Court to strike references to the consent decree between CMC and the New York Attorney General. Mot. Strike at 17–18. Corporate Defendants argue for this exclusion on the grounds that the consent decree was not the result of an adjudication and that the decree provides it is not intended for use by any third party in any other proceeding and is not intended as an admission of liability by CMC.

Corporate Defendants rely on Lipsky for the proposition that a consent decree cannot be used as evidence in subsequent litigation because it was not the result of an actual adjudication of any of the issues. Mot. Strike at 17–18. However, as the Lipsky court noted, "Evidentiary questions . . . should . . . be avoided at such preliminary stage of the proceedings." Lipsky, 551 F.2d at 893. "[O]rdinarily neither a district court nor an appellate court should decide to strike a portion of the complaint on the ground that the material could not possibly be relevant on the sterile field of the pleadings alone." Id. The Court therefore declines to do so in this case. Furthermore, the Second Circuit has held that, while a consent decree may not be admitted to prove the truth of the matter asserted in the decree, it may be admitted for other purposes. United States v. Gilbert, 668 F.2d 94, 97 (2d Cir. 1981). Here, Plaintiff intends to offer the consent decree "for purposes of knowledge, notice, motive, and modus operandi." Pl.'s Resp at 31. Such purposes are relevant to a determination of Monell liability. In order to prove Monell liability, a plaintiff must prove that official policy caused the alleged constitutional injury. Roe, 542 F.3d at 36. One way to establish the existence of such a policy is through a showing of "deliberate indifference" by high-level officials. See supra Part I(3)(a). Actual knowledge or notice of

constitutional violations (even if at another facility), as this consent decree purports to show, are relevant to establishing "deliberate indifference".

Corporate Defendants further argue, "Since it is not alleged herein that [CMC] even was the medical care services provider at SCCF at the time at issue" then the references to the consent decree "are unequivocally inflammatory and irrelevant on their face inadmissible." Mot. Strike at 18. As discussed above, Plaintiff has adequately alleged CMC had a policy of sanctioning inadequate medical care that violated Plaintiff's constitutional rights. <u>Supra</u> Part I(3)(b)(1). Because Plaintiff intends to offer the consent decree as evidence that CMC had such an unconstitutional policy, then Plaintiff's references to the decree "bear[] on the dispute" and the Court declines to strike them. <u>See</u> <u>Citigroup</u>, 613 F. Supp. at 489.

### 2. Bribery Between CMC and Sheriff D'Agostino

County Defendants argue that Plaintiff's allegations "Sheriff D'Agostino accepted campaign contributions as a bribe in order to overlook deaths of inmates at this facility are scandalous, speculative, specious, and conclusory." Mot. Strike at 19. Plaintiff has alleged that Sheriff D'Agostino had an "enormous incentive to hire CMC, despite their long and troubled history" because he received "thousands of dollars" in "campaign contributions." <u>See</u> Compl. ¶¶ 60–61. Campaign contributions do not necessarily equate to bribes, and the Court is not persuaded to read the Complaint as asserting CMC bribed Sheriff D'Agostino for its contract with Schenectady County.

Furthermore, that Sheriff D'Agostino may have accepted campaign donations from CMC bears on whether Schenectady County "renewed [CMC and CBH's] contract to provide healthcare at [SCCF] over the course of multiple years" despite the County's awareness of

"[CMC and CBH's] troubled history, and its capitation business model," id. ¶ 62, as such

contributions could plausibly serve as evidence that a public official who may have had a hand in

contracting for CMC and CBH's services at SCCF was more willing to overlook those problems.

Consequently, the Court will not strike Plaintiff's allegations regarding Sheriff D'Agostino's

acceptance of campaign donations from CMC.

### 3. Albany Times Union Article

Corporate Defendants also urge the Court to strike allegations of inadequate care included

in an Albany Times Union article. Mot. Strike at 19. The Court declines to strike these

allegations for similar reasons as it refuses to strike allegations pertaining to the consent decree

between CMC and the New York Attorney General: the article "bear[s] on the dispute" since it,

like consent decree, suggests that CMC had a policy of sanctioning inadequate medical care that

violated Plaintiff's constitutional rights. See Citigroup, 613 F. Supp. at 489. "Evidentiary

questions" regarding the admissibility of the article "should . . . be avoided at such preliminary

stage of the proceedings." See Lipsky, 551 F.2d at 893.

### 4. Allegations Pertaining to CMC

Corporate Defendants also implore the Court to strike certain other allegations pertaining

to CMC, including that it has been sued "successfully on countless occasions" and that the

Commission recommended terminating CMC's contracts in certain counties because of improper

treatment of inmates. Mot. Strike at 20. The Court will not strike the Commission

recommendation that CMC's contracts be terminated and the discussion of the other lawsuits

against CMC because they also speak to knowledge and notice, which is relevant to Monell

liability. The Court currently makes no determination on the eventual admissibility of such

evidence, but given the "highly disfavored" status of motions to strike, <u>E\*Trade Fin. Corp.</u>, 2013 WL 4016220, at \*7, the Court will not grant this aspect of the Motion to Strike at this stage.

## V.    CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that the County Defendants' Motion to Dismiss (Dkt. No. 10) is **DENIED**. Plaintiff's claim against Schenectady County may proceed; and it is further

**ORDERED**, that Corporate Defendants' Motion to Dismiss (Dkt. No. 11) is **GRANTED in part**. Plaintiff's claim against Umar is **dismissed without prejudice**; and it is further

**ORDERED**, Plaintiff may move to replead her claim against Umar within **sixty days** of the date of this Memorandum-Decision and Order; and it is further

**ORDERED**, that Corporate Defendants' Motion to Dismiss is otherwise **DENIED**. The claims against CMC, CBH, and John Does 1–3 may proceed; and it is further

**ORDERED**, that Defendants' requests for relief under Rule 12(f) are denied; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**


DATED:    September 16, 2019
          Albany, New York

Lawrence E. Kahn
U.S. District Judge